# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 4, 2012

## STATE OF TENNESSEE v. TERRY GREEN

### Appeal from the Criminal Court of Shelby County
### No. 10-02604    James M. Lammey, Jr., Judge

### No. W2011-02163-CCA-R3-CD  - Filed December 21, 2012

Terry Green ("the Defendant") entered a best interest plea to one count of theft of property of $10,000 or more but less than $60,000, with no agreement as to his sentence. Following a sentencing hearing, the trial court denied judicial diversion and sentenced the Defendant to a term of four years, with four months to be served in confinement. The trial court suspended the remainder of the sentence, placing the Defendant on probation for a period of five years. On appeal, the Defendant contends that the trial court erred in denying the Defendant's application for diversion and/or his request for full probation. The Defendant also claims that the trial court, in determining whether to grant or deny judicial diversion, erred in allowing "evidence of allegations of wrongdoing that had nothing to do with the case before the [c]ourt" and erred in "giving more weight to that evidence." After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. ALAN E. GLENN, J., not participating.

Javier Bailey (at trial) and Paul Springer (on appeal), Memphis, Tennessee, for the appellant, Terry Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Rob Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was indicted for theft of property of $10,000 or more but less than $60,000, a Class C felony,[1] in April 2010. According to the indictment, the circumstances of the offense arise out of the theft of a motor vehicle owned by Jim Keras Nissan, which occurred "between April 25, 2009 and September 2, 2009." He entered a best interest plea to the indicted offense on June 28, 2011, leaving the sentence to be determined by the trial court, including the Defendant's request for judicial diversion.

At the plea hearing, the State recited the following facts as the basis of the Defendant's plea, to which the Defendant "stipulate[d] that those are the facts the [S]tate would have presented had the matter gone to trial":

> [O]n April 26th, 2009, the [D]efendant went to . . . purchase a car from Jim Keras Nissan. At the time, he was without funds to make this purchase. He then – well, after he purchased it, attempted to purchase two other vehicles from North Little Rock.
>
> Jim Keras Nissan called and tried to get the money for the purchase that he had made from them. [The Defendant] told them he was working on it. He switched his account – switched at the bank to purchase a vehicle from this other company. The car was never returned to Jim Keras Nissan.
>
> . . . [A]round a year later, [the Defendant] took it to 4069 New Willow where a man named Rickey Munn helped to dismantle part of it.
>
> This was in Shelby County, Tennessee; and the value of the car was around forty-five thousand dollars.

Following the State's recitation of the facts, defense counsel stated that the Defendant would stipulate to the "contract for purchase of the vehicle," but presented the following facts instead:

> [I]t would have been the contention of the defense that there was never any intent to steal this vehicle; that an argument ensued between [the Defendant] and the people at Jim Keras from whom [the Defendant] had purchased several

---

[1] See Tenn. Code Ann. § 39-14-103(a), -105(a)(4) (2006).

cars with cash years before – particularly one year prior; that [the Defendant] provided his true name, his true address, his true social, all of the pertinent information for financing.

After going to Little Rock and finding the exact same vehicle for four thousand dollars less, and after he had done so much business with them, [the Defendant] became irritated and frustrated. . . . [T]hey were defrauding him – they were taking advantage of him.

So, [the Defendant] told them to come and get their vehicle.

After they didn't come get the vehicle, the proof would have been that [the Defendant] had gone through a divorce and had lost the house in the divorce. So, he had some ten or eleven vehicles, all of them Nissans. He restores – antiquing some, also – and that [the Defendant] had to store his vehicles in various places because he could no longer keep them on the property that he called home.

So, this car ended up with this gentleman. It would have been our contention that there was never any exchange of money between Mr. Munn and [the Defendant]; and that [the Defendant] just basically left the car there. And a year later, Mr. Munn started taking parts off of it. And that's how Mr. Munn got caught with the vehicle; and Mr. Munn implicated – or indicated that [the Defendant] had brought the vehicle there and left it.

At the sentencing hearing,[2] Terry Payne, general manager at Jim Keras Nissan ("JKN"), testified that he supervises the sales that occur at that location. He testified that the Defendant arranged to purchase a blue, 2009 Nissan 370Z, VIN number JN1AZ44E09M404920 ("Nissan 370Z"), from JKN on April 26, 2009. The total sales price, including "taxes and dock fees[,]" was $55,692.60. The Defendant was a previous customer, so the employees at JKN were familiar with him. In terms of financing the purchase of the Nissan 370Z, the Defendant brought a "business card of the banking institution [Regions Bank] that he was going to finance the [Nissan 370Z] from." Payne testified, "We called that banker who said that he had approved a loan for [the Defendant] and we could deliver him

_____

[2] The sentencing hearing was held on two separate days. On August 15, 2011, the sentencing hearing began, and the State called Terry Payne, Rickey Munn, and Otis Campbell to testify. The remainder of the sentencing hearing was reset so that defense counsel could discuss with the Defendant whether or not he should testify in light of the State's witnesses. On September 1, 2011, the sentencing hearing continued. No additional witnesses testified on this date.

the car[.]" Further, the "banker" stated that as soon as the Defendant signed "the papers at Regions Bank," JKN could collect the money from Regions Bank for the Nissan 370Z.

An alternative financing plan also was devised in the event that the prior arrangements with Regions Bank did not work out. In this regard, the Defendant signed a contract that if Regions "did not approve the loan or finish the loan," that he would finance the Nissan 370Z through the Nissan Motor Acceptance Corporation. The Defendant took possession of the Nissan 370Z on the same date, April 26, 2009.

Payne called the Defendant approximately four days after the Defendant "took delivery" of the Nissan 370Z because JKN had not received payment for the vehicle yet. The Defendant told Payne that "he hadn't had a chance to get by Regions Bank, [but] that he was going to go by Regions Bank and sign the papers." Payne also called the Defendant a second time. During this conversation, the Defendant told Payne that "he was busy and he had not had a chance to go by Regions Bank yet." Payne's next phone call was to Regions Bank. An employee at Regions Bank told Payne that the Defendant had been approved to finance the Nissan 370Z but that the Defendant still needed to sign the paperwork. The employee said that Regions Bank could not give JKN the money for the Nissan 370Z until the Defendant signed the paperwork. JKN never received the paperwork the Defendant was supposed to sign at Regions Bank.

Payne testified that he also attempted to finance the Nissan 370Z through the Nissan Motor Acceptance Corporation pursuant to the alternative financing plan in the Defendant's contract. According to Payne, he turned the "application into Nissan, and they could not continue the investigation on it because [the Defendant] had a lock on his account." He described the "lock" on the Defendant's account as a "fraud alert." A "fraud alert" is placed on an individual's account when that "individual calls the bureau and puts a fraud alert on it."

Ultimately, the Defendant never paid for the Nissan 370Z, and he never returned it to JKN. Additionally, the Defendant never informed JKN of the location of the Nissan 370Z so that JKN could repossess it.

Lastly, Payne testified that Detective Transom contacted him about a year after the Defendant took possession of the Nissan 370Z, and Detective Transom told Payne that the Nissan 370Z was recovered at "a chop shop." Payne stated, however, that JKN did not attempt to retrieve the Nissan 370Z from the "chop shop."

On cross-examination, Payne agreed that the Defendant had purchased vehicles at JKN before, that the Defendant gave JKN a "good telephone number where you could reach

him," and that JKN had "a profile on [the Defendant] . . . with an address and all that on there." Payne also agreed that the Defendant did not give him "any kind of phony information as to how to find him[.]"

Payne testified that JKN sent a "repo man" to the Defendant's residence to repossess the Nissan 370Z. Although Payne could not remember the date that this occurred, he said, "My bill at the dealership from the repo man" reflects that someone was sent to retrieve the Nissan 370Z from the Defendant's residence. When the "repo driver" arrived at the Defendant's residence, the Defendant "came out and told the repo driver that before he touched that car, he better look at the VIN number on it. . . . And he looked at the VIN number on it, and it was not the car that he had gotten from us." The "repo driver" asked the Defendant where the vehicle was, and the Defendant stated that "he didn't know."

Payne agreed that "the reason that this transaction . . . was not complete was because [the Defendant] did not follow through on the loan paperwork." Payne also testified that he called the Defendant and said, "We need to be either paid for the car; or if you've changed your mind and don't want to buy the car, just bring the car back." The Defendant responded, "I haven't had time to go to the bank." After this conversation, the Defendant would not return any of Payne's telephone calls. Moreover, in response to being asked whether the Defendant unlawfully took the car from JKN, Payne replied, "False pretenses. He told us he was going to the bank to sign the papers and didn't."

Rickey Munn testified that the Defendant is "one [of] my wife's in-laws." In May 2010, Munn was living at 4069 New Willow in Shelby County, Tennessee. He testified that sometime in May 2010 his "wife's daddy" accompanied the Defendant to his (Munn's) house because the Defendant wanted to store his Nissan 370Z there. The Defendant was driving a yellow car at the time and brought the Nissan 370Z on "a wrecker." The Defendant told Munn that he would pay Munn $150 if the Defendant could store the Nissan 370Z at Munn's residence. He told Munn that he needed to store that vehicle there because he "had a business on Lamar" but was moving to a new business and could not keep his vehicles at that location any longer. Munn agreed to allow the Defendant to store his Nissan 370Z at Munn's residence, and Munn stored it in his garage.

Munn testified that he saw the Defendant bring a "[t]ool box, tools, a hoist, a motor hoist," and an orange "engine puller" to Munn's house. He also testified that while the Nissan 370Z was in his garage, he observed the Defendant remove parts off of it. Later,

police officers came to his house and arrested Munn. Munn initially was charged with auto theft, but the case against him later was dismissed.[3]

On cross-examination, Munn denied that the Defendant brought the Nissan 370Z to him because he had "a chop shop." He further denied that his house was "a chop shop" or that he was "running a chop shop[.]" According to Munn, about a month and a half after the Nissan 370Z was stored in his garage, the Defendant asked him to remove parts off of it. The Defendant told Munn that "he wrecked his other [car] – ran into a retainer wall" and needed parts off of the Nissan 370Z to put on the wrecked car. Munn agreed that the Defendant "wasn't asking [him] to chop it up and sell parts." Munn was aware that the Defendant "had two blue [370Zs], a yellow [370Z], and he had 'em at his business on Lamar that he was movin'." He agreed that the Defendant "collects them and restores them."

Next, instead of the State calling Detective Transom, defense counsel stipulated that the Nissan 370Z which was stored in Munn's garage was the same vehicle that "was taken from Jim Keras Nissan" to which Terry Payne testified.

Otis Campbell, a special agent criminal investigator with the Naval Criminal Investigative Service ("NCIS"), testified that he was investigating the Defendant, who was previously in the military, for "[f]orgeries and mail fraud." He stated, "It appears as though [the Defendant] has been creating military documents called the VD214s." The VD214s are "documents that miliary members receive upon their retirement or exit out of the military" which can be used to obtain educational credit. He stated that the VD214 document "basically [says] I was in the military from this - and then this is the training, supposedly obtained while in the military." According to Special Agent Campbell, the Defendant was creating the VD214 documents for individuals who were never in the military so that they could use the documents to obtain barber licenses.

Special Agent Campbell testified that "VD214s were showing up at the state boards in Mississippi and Tennessee[]" with application packages to obtain barber licenses. According to Special Agent Campbell, the Defendant also notarized six of the application packages for barber licenses.[4] Agents at NCIS then ran background checks on the

_____

[3] According to the State, the case was dismissed because it "went to a probable cause hearing[ ] [and] no probable cause was found[.]" Moreover, Munn was never indicted for this because the State said that it "reviewed the case and determine[d] we had the wrong guy."

[4] The trial court asked the witness whether the Defendant is a notary. The witness stated that he does "not have information as to whether or not he's actually a notary or not." Defense counsel then stated, "He was a notary. . . . [The Defendant] was part owner of a tax company. And he does preparations – does them
(continued...)

individuals who submitted the fraudulent VD214 documents with their application packages, and NCIS discovered that those individuals were never in the military. The Tennessee and Mississippi state boards actually had issued barber certificates to these individuals, however, based on the information that was obtained from the documents.

Special Agent Campbell presented the individuals who submitted the fraudulent VD214 documents with a photographic lineup which contained a photograph of the Defendant, and each individual pointed to the Defendant "as the person who devised the screen and manufactured the document for them." Special Agent Campbell testified that approximately sixty-three individuals received these fraudulent VD214 documents. He stated that the Defendant would receive money in exchange for the fraudulent VD214 document. During his investigation he discovered that individuals paid the Defendant between $300 and $1,200 for this document. Special Agent Campbell's investigation "only went back three years," but he stated that he has "evidence that shows that it goes all the way back eight years."

Lastly, Special Agent Campbell testified that "[t]here's currently a warrant out for [the Defendant's] arrest for mail fraud." At the time of the hearing, he said that "it's just one [count of mail fraud]; and it was just pending – him being taken into custody to get the process started." According to Special Agent Campbell, the Defendant was going to be taken into custody that day.

On cross-examination, Special Agent Campbell testified that in northern Mississippi "[a] grand jury has heard the case, and they have returned an indictment [for mail fraud]." He did not remember, however, how many counts the grand jury returned.[5] Additionally, he said that the actual charge is "mail fraud" because the Defendant "caused those documents to be put in the United States mail." He testified that there are "a couple of witnesses stating that [the Defendant] mailed them off; and we do have an application package in which [the Defendant] mailed his own individual papers [for a barber license] actually this year." To the best of his knowledge, however, the Defendant did not have a barber license procured by a fraudulent VD214 document.

Lastly, Special Agent Campbell said that he was not aware that the Defendant was in "drug rehab" but that he did see "some documents where he went missing on some police

---

[4](...continued)
electronic, the paperwork has to be notarized."

[5] It is unclear whether the indictment out of northern Mississippi for mail fraud to which Special Agent Campbell testified on cross-examination is the same pending count of mail fraud to which he testified on direct examination.

reports; and some police reports did indicate that he may have had some drug issues." He also did not know that the Defendant "was in the Veterans Administration Hospital for a good period of time on more than one occasion[.]"

The Defendant did not testify at the sentencing hearing. Defense counsel initially stated that the Defendant would testify but requested the trial court's permission to allow him (defense counsel) to advise the Defendant, on the stand, about his Fifth Amendment right on any pending matters that were not charged at that time. The trial court responded, "You can [al]locute, and that way he's not subject to cross examination; but if he takes the stand, under oath, I'm going to allow the [S]tate to ask him about this new case. . . . But, if he's going to testify, he's going to testify subject to cross examination on everything that was presented. Or he could [al]locute. Those are his two options." Accordingly, the Defendant decided that he would not take the stand and would "give an [al]locution prior to [the court] making a final decision." Nevertheless, the record indicates that the Defendant never gave a statement of allocution.

The presentence report was admitted as an exhibit without objection. At the conclusion of the proof at the sentencing hearing, the trial court denied judicial diversion and sentenced the Defendant as a Range I, standard offender to a term of four years, with four months to be served in confinement. The trial court suspended the remainder of the sentence, placing the Defendant on probation for a period of five years. The Defendant timely appealed his sentence, contending that the trial court erred in denying the Defendant's application for diversion and/or his request for full probation. The Defendant also claims that the trial court, in determining whether to grant or deny judicial diversion, erred in allowing "evidence of allegations of wrongdoing that had nothing to do with the case before the [c]ourt" and erred in "giving more weight to that evidence."

**Analysis**

*Judicial Diversion*

Judicial diversion is a form of "legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) (citing Tenn. Code Ann. § 40-35-313(b)). We review the trial court's decision to grant or deny judicial diversion under an abuse of discretion standard. State v. Robinson, 328 S.W.3d 513, 519 (Tenn. Crim. App. 2010) (citing State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997)); see also State v. Amanda Kay Profitt, No. E2012-00373-CCA-R3-CD, 2012 WL 6016889, at *5 (Tenn. Crim. App.

Dec. 4, 2012). Thus, we will not interfere with the trial court's denial of judicial diversion if the record contains "any substantial evidence to support the refusal." State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996) (citations omitted); see also Robinson, 328 S.W.3d at 519.

Pursuant to Tennessee Code Annotated section 40-35-313, a trial court "may, at its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt." Robinson, 328 S.W.3d at 519 (citing Tenn. Code Ann. § 40-35-313(a)(1)(A)). For purposes of judicial diversion, a "qualified defendant" is one who:

(a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;

(b) Is not seeking deferral of further proceedings for a sexual offense, a violation of § 71-6-117 or § 71-6-119, or a Class A or Class B felony; and

(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(a)-(c) (Supp. 2007). Nevertheless, a defendant, even if qualified, is not entitled to a presumption that he is a favorable candidate for judicial diversion. See State v. Anderson, 857 S.W.2d 571, 573 (Tenn. Crim. App. 1992).

In determining the appropriateness of judicial diversion, the trial court shall consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. Robinson, 328 S.W.3d at 520 (citing Parker, 932 S.W.2d at 958; Cutshaw, 967 S.W.2d at 343-44); see also State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). The trial court also should consider whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the interests of the defendant. Robinson, 328 S.W.3d at 520; see also Lewis, 978 S.W.2d at 566. The record must reflect that the trial court has weighed all of these factors in reaching its determination. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); see also Parker, 392 S.W.2d at 958-59.

We first address the Defendant's challenge to the admission of "evidence of allegations of wrongdoing that had nothing to do with this case" and the trial court's "giving more weight to that evidence that [the Defendant] had never been charged with." In this case, the trial court admitted testimony concerning alleged criminal conduct by the Defendant involving allegations of forgeries and mail fraud resulting from a NCIS investigation. We conclude that the trial court did not err in the admission of this evidence and did not give

improper weight to this evidence. This Court repeatedly has held that a trial court can consider a defendant's criminal behavior in denying judicial diversion. See, e.g., State v. Robinson, 139 S.W.3d 661, 665 (Tenn. Crim. App. 2004) (holding that the trial court properly considered evidence of prior criminal conduct, which the defendant was not indicted on or convicted of, in denying judicial diversion); State v. Beverly, 894 S.W.2d 292, 293-94 (Tenn. Crim. App. 1994) (holding that criminal behavior not resulting in a conviction may be considered in making the judicial diversion decision); State v. Aune Kornegay, No. E2007-00645-CCA-R3-CD, 2008 WL 1901115, at *6 (Tenn. Crim. App. April 30, 2008) ("[A] trial court may properly consider a defendant's criminal behavior in determining whether to grant judicial diversion to an eligible defendant."); State v. Tommy Smith, No. 03C01-9503-CR-00074, 1996 WL 74711, at *1 (Tenn. Crim. App. Feb. 22, 1996) ("Although not resulting in convictions, a defendant's prior criminal behavior is a sufficient basis to deny judicial diversion.").

The Defendant also challenges the trial court's overall denial of judicial diversion. In denying judicial diversion, the trial court considered the factors applicable to diversion.[6] Based upon our review of the findings of the trial court regarding the relevant factors for determination of whether to grant or deny diversion, we hold the trial court's decision to deny judicial diversion is supported by substantial evidence in the record. We agree with the trial court that the "circumstances of the offense[] . . . [are] . . . troubling" and "weigh against" diversion. In this regard, the trial court noted that the Defendant "drove out with a fifty-five thousand dollar car, and he never came back with it." The Defendant did not secure financing through Regions Bank as he agreed, and when JKN attempted to finance the Nissan 370Z through the Nissan Motor Acceptance Corporation pursuant to the alternative financing plan in the Defendant's contract, it could not proceed because the Defendant had placed a "fraud alert" on his account. Later, the Defendant paid Munn $150 to store the Nissan 370Z in his garage, and Munn testified that the Defendant asked him to remove parts off of the vehicle while it was in his garage. Additionally, Munn testified that he saw the Defendant remove parts off of the vehicle while it was in his garage. Moreover, as the trial

_____

[6] At the time of sentencing, the trial court noted that it could not grant the Defendant diversion that day even if it determined that diversion was warranted because the "TBI report" was not in the file. Defense counsel stated, "I thought we had done one, but if Your Honor doesn't see that – I don't have it, so if Your Honor doesn't see it in the jacket, then I don't know what happened." Nevertheless, the trial court analyzed whether it should grant or deny judicial diversion, stating, "I have no proof that he's actually eligible for diversion, but just in case you come up with that form, I need to go through this judicial diversion – the criteria – whether or not to grant or deny judicial diversion." A "certificate from the Tennessee bureau of investigation stating that the defendant does not have a prior felony or Class A misdemeanor conviction" is required before a trial court can enter an order granting judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(3)(A) (Supp. 2007).

court pointed out, Munn was arrested for auto theft because the vehicle was recovered in his garage.

Although the trial court found no proof in the record of any prior criminal conviction of the Defendant, the trial court implicitly accredited Special Agent Campbell's testimony regarding the NCIS investigation of the Defendant concerning allegations of forgeries and mail fraud. Moreover, the proof established that, at the time of the hearing, the Defendant had been indicted on at least one count of mail fraud related to this investigation. Based upon this proof, the trial court weighed this criminal behavior against a grant of diversion to the Defendant. We also agree with the trial court that this evidence of prior criminal behavior weighs against diversion.

We acknowledge that some factors weighed in favor of judicial diversion, i.e. the Defendant's service in two branches of the military and the Defendant's physical and mental health. Nevertheless, the record supports the trial court's decision to accord these factors little weight under the circumstances of this case.

In summary, the record contains substantial evidence supporting the trial court's conclusion that the Defendant is not a good candidate for judicial diversion. For these reasons, the trial court did not abuse its discretion in denying judicial diversion.

*Probation*

The Defendant also argues that the trial court erred in denying his application for probation. The trial court, however, did grant the Defendant probation after service of four months in confinement. We, therefore, construe this as a challenge to the trial court's denial of full probation and imposition of a period of confinement. The Defendant raises no issues with respect to the length of his sentence, four years, or the length of his probationary period, five years.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Susan Renee Bise, ___ S.W.3d ___, ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). Thus, this Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

Our supreme court recently held that the Bise standard of review is also applicable to "questions related to probation or any other alternative sentence." State v. Christine Caudle, ___ S.W.3d ___, ___, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. Nov. 27, 2012). Thus, in reviewing a trial court's denial of full probation, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id. The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In making its sentencing determination, a trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2006).

When a court determines the manner of service of a sentence, a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code

Ann § 40-35-102(5)-(6)(A) (Supp. 2007). However, the trial court is "not bound" by this advisory sentencing guideline; rather, it "shall consider" it. Id. § 40-35-102(6)(D). The defendant bears the burden of establishing his or her suitability for full probation. See State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-303(b)); State v. Mounger, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" Carter, 254 S.W.3d at 347 (citations omitted).

As stated above, the Defendant challenges the trial court's denial of full probation and imposition of a period of confinement. In determining whether to deny full probation and impose a sentence involving confinement, the trial court should consider the following:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2006); see also Carter, 254 S.W.3d at 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Id. § -103(2), (4). A trial court also should consider a defendant's potential for rehabilitation or lack thereof when determining the manner or length of the sentence. Id. § -103(5).

For many of the same reasons that the trial court denied judicial diversion, the trial court also concluded that full probation was not appropriate. Additionally, the trial court determined that a sentence of full probation would depreciate the seriousness of this offense. Finally, the trial court found that the proof reflected a poor chance of rehabilitation of the Defendant.

We discern no error by the trial court in ordering the Defendant to serve four months in confinement and then being placed on probation for five years. In denying full probation and ordering a period of confinement, the trial court took into account the appropriate sentencing considerations. The proof in the record before us clearly does not rebut the presumption of reasonableness afforded the trial court's decision. Therefore, we conclude

that the trial court did not abuse its discretion.  Accordingly, the Defendant is not entitled to relief.

## **Conclusion**

For the foregoing reasons, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE